IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STAFFORD INVESTMENTS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 04-3182 |
| | : | |
| ROBERT A. VITO | : | |

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                           **May 14, 2009**

Plaintiff Stafford Investments, LLC, and Defendant Robert A. Vito ask me to overturn a jury verdict which found Vito breached an investment contract with John Stafford Jr. and John Stafford III but awarded no damages and found the Staffords were entitled to rescission and awarded no damages. I find a consistent reading of the seemingly inconsistent verdict, and will deny both motions.

**FACTS**[1]

Vito is an entrepreneur who invented an "unbreakable" lock, called Autolock, for automobiles and then boats. He founded Lawman Armor Company to market the device, but retained personal control of the patents which he licensed to Lawman. Lawman hired Robert Martin and Donald A. Milne III of Corporate Equities Group (CEG) to find private financing for Lawman and issued a first private placement memorandum[2] to raise $1 million to begin production of the

_____

[1]In considering judgment as a matter of law, the Court "look[s] at the evidence in the light most favorable to . . . the verdict winners, and draw[s] all reasonable inferences in their favor." *Foraker v. Chaffinch*, 501 F.3d 231, 234 (3d Cir. 2007) (citation omitted).

[2]Testimony in this case involves two private placement memoranda, one issued to raise $1 million and the second in July 1999 issued to raise $3.5 million. The dispute centers on the July memorandum which the Court will distinguish from the January memorandum by using initial capital letters (hereinafter "Private Placement Memorandum"). The July Private Placement Memorandum was closed July 23, 1999, when its goal was met.

Autolock.

Joshua Smith and Humbert Powell, both well-regarded entrepreneur investors, joined the Board of Lawman in response to CEG's solicitation.  Martin, Milne, and directors Smith and Powell learned in April 1999 Vito was involved in litigation stemming from a bankruptcy of a company he had owned earlier, Elcom Technologies Corporation.  During a limousine ride from Powell's office to a dinner party celebrating the closing of the first round of financing for Lawman, Powell produced an article from the April 1999 issue of Forbes magazine detailing Vito's role in the failure and bankruptcy of Elcom.[3]  N.T. 1/13/09 p.m., 91:4-5.  Milne testified[4] both Powell and Smith showed concern and discussed the timing of disclosing the litigation.  Martin testified Vito explained the Elcom litigation sufficiently to satisfy the Board, but that he (Martin), Smith, and Powell believed the next Private Placement Memorandum needed to disclose the litigation.

Lawman solicited a second financing tranche with the Private Placement Memorandum dated July 1, 1999.  The Private Placement Memorandum included the representation "[n]either Lawman or any of its officers, directors or shareholders is currently engaged in any litigation involving the Company.  Further, there is no pending or threatened litigation involving Lawman or any of its officers, directors or shareholders."  Ex. 16 at 25.

Charlestown, LLC, an investment entity controlled by Stafford Jr. and Stafford III, invested

_____

[3]The 1998 complaint in the Elcom litigation alleged Vito and others breached their duties of care and their fiduciary duties, and made unauthorized pre-petition transfers of money and benefits.  Ex. 76. The Elcom litigation threatened Vito's assets, including the Unbreakable patents and his shares of Lawman.  None of the participants in the dinner remembered when they first saw the complaints in the adversarial litigation stemming from the Elcom bankruptcy.  The Forbes article refers only to the company's bankruptcy.

[4]Milne testified through a videotaped deposition for which Vito's attorney was not present.

in Lawman in response to the Private Placement Memorandum.[5]  In return, Vito offered the group

two seats on the Board.  Stafford Jr. and Stafford III joined the Board at a special meeting on October

20, 1999.

The next summer, the Staffords purchased 300,000 shares of Lawman stock directly from

Vito for $1,050,000.  The contract for that purchase incorporated by reference the July 1, 1999

Private Placement Memorandum and a July 22, 1999 Addendum.[6]  Ex. 78 at 2.  The contract also

represented the buyers "had the further opportunity to obtain any information which [the Staffords]

deemed necessary to evaluate [their] investment in the securities and to verify the accuracy of the

information otherwise provided . . . ."  N.T. 1/12/09 p.m., 127:22-25.

The relationship between the Staffords and Lawman soured.  In 2004, the Staffords filed a

five-count[7] Complaint against Vito, alleging a violation of Section 10(b) of the Exchange Act of

1934, 15 U.S.C. § 78j; a violation of the Pennsylvania Securities Act, 70 Pa. C. S. § 201-1; breach

of contract, and common law fraud, based on Vito's failure to disclose the Elcom litigation which

was ongoing when the Staffords purchased the 300,000 shares from Vito in July 2000.[8]

Stafford III testified if he had seen the Elcom allegations before investing in Lawman, he

"would not have invested."  N.T. 1/13/09 a.m., 49:8.  Stafford III testified the Elcom bankruptcy

---

[5]Counsel are reminded that should Exhibit 28, listing the Charlestown partners, or any other similar document be re-published during an appeal or otherwise, counsel have an obligation to redact Social Security numbers.  Local R. Civ. P. 5.1.3.

[6]The Private Placement Memorandum was closed on July 23, 1999.  The Lawman Board voted to ratify the Private Placement Memorandum, as amended, on October 20, 1999.

[7]One count was dismissed by agreement.

[8]The two Elcom cases were "settled against Vito" in April 2001.  N.T. 1/13/09 a.m., 48:3-4.

would not have meant anything to him but the accusation of fraud would have "meant everything." N.T. 1/12/09 p.m., 111:4-5.  Stafford III claimed Vito never divulged the existence of the Elcom litigation to him.  Stafford III stated, "There's no crime in being associated with a company that goes bankrupt. . . . [B]ut when you're accused of fraud . . . and beyond fraud you're talking about using assets of the company for your own use, bad faith . . .  that's what would have stopped me from making the investment."  N.T. 1/12/09 p.m., 110:19-111:2.

Trial testimony primarily addressed two questions: when the Staffords learned of the Elcom litigation and who added the representation there was no pending or threatened litigation to the July 1, 1999 Private Placement Memorandum.

The Staffords had three opportunities to learn more about the Elcom litigation.  The first was during due diligence conducted by Martin A. Fiascone, a Stafford investing partner.  Fiascone testified he searched the state criminal and civil dockets for adverse information but did not search the federal dockets, which would have revealed the Elcom litigation.  Fiascone, who has since parted litigiously from the Staffords, testified Vito told him he (Vito) had worked for Elcom, was involved in a dispute with his successors at Elcom, and there was some sort of bankruptcy filing.  N.T. 1/14/09 a.m., 10:7-10.  Fiascone stated he told Stafford III "[t]here was a dispute and that the people that had acquired  . . . Elcom had filed for bankruptcy. . . . Dispute in bankruptcy means to me litigation." N.T. 1/14/09 a.m., 11:18-22.

The second mention of the Elcom litigation was in a July 22, 1999 letter Vito sent the Staffords welcoming them to the Board of Lawman.  The July 22 letter asks the Staffords for their biographies to share with the other Directors.  Vito wrote, "As we discussed, in as much as you and your father will be serving on the Board of Directors and as an Addendum to Lawman's Private

4

Placement Memorandum, I have attached the detailed biographies of the Board of Directors, Management team and Company advisors for your review." Ex. 130 at 3.  Buried in the Addendum is information about the bankruptcy of a corporation founded by Board member Joshua I. Smith and reference to the Elcom litigation in the center of Vito's one paragraph biography:

> From September 1993 to March 1997, Mr. Vito served as Chief Executive Officer and Director of Elcom Technologies Corporation, a start-up technology company.  In March 1998, one year after Mr. Vito's departure from the Company when he was no longer an Officer or Director and under different management, Elcom commenced reorganization proceedings under chapter 11 of the bankruptcy code.  About six months later, the company ceased business operations.

Ex. 130 at 5.

The third discussion of Elcom occurred before an October 20, 1999 special meeting of the Lawman Board, during which Stafford Jr. and Stafford III were elected to the Board.  Powell testified, "Rob disclosed everything and anything he could on Elcom because at the meeting before we had the board meeting, that was completely discussed.  We want full disclosure on everything to the Staffords so that they know what it is because we had just learned of it."[9]  N.T. 1/14/09 a.m., 102:20-25. Powell stated Vito gave the Staffords a copy of the Forbes article.   Powell also stated the Staffords did not ask Lawman to buy back their stock.  N.T. 1/14/09 a.m., 101:17-18.

Blessey confirmed Powell's testimony and recalled, "[O]ne of the Staffords asked the question as to whether or not that litigation would have any effect on Lawman, and the response was, from Mr. Vito, it would not." N.T. 1/14/09 p.m., 20:15-17.  Vito testified he told the Staffords about the Elcom litigation.

Both Staffords testified there was no discussion of the Elcom litigation at the October 1999

---

[9]It appears Powell misstated when he initially learned of the Elcom litigation because both his previous testimony and that of others show he learned of the litigation in the spring of 1999.

Board meeting.  Stafford III stated, "[I]f I had known that at that time, I pretty much would have flipped out." 1/12/09 p.m., 65:8-10.  The minutes of the meeting, taken by Joseph A. Bobrowski, chief financial officer and secretary of Lawman, do not record a discussion of Elcom.  Powell and Blessey said the discussion took place before the board meeting and Bobrowski's notes began.

The Staffords also attempted to prove fraud or intentional misrepresentation in the drafting of the Private Placement Memorandum, which they argue was designed to fraudulently induce them to invest in Lawman.  Their theory was Vito intentionally misled them about the Elcom litigation by omitting it from the Private Placement Memorandum.  Vito argued the drafting lawyers made the representation about no litigation by mistake.

Testimony was inconclusive as to who actually drafted the July Private Placement Memorandum.[10]   Martin testified Blessey produced a first draft of the Private Placement Memorandum.  N.T. 1/13/09 p.m., 64:11-15.  Bobrowski exchanged drafts of the Private Placement

---

[10]The first private placement memorandum is dated January 29, 1998.  Vito testified the first private placement memorandum was written by Robert Blessey, Esq., CEG's attorney, and issued in January 1999.  N.T. 1/20.09  a.m., 16:16-19.   Robert W. Cleveland, Esq., of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, testified he prepared the first private placement memorandum in January 1998.  N.T. 1/13/09 p.m., 8:3-25.  Vito also testified he stopped using Blessey and changed to Klehr, Harrison because he objected to Blessey's fees.  N.T. 1/20/09 a.m., 17: 9.  Martin of CEG testified Vito engaged CEG in January 1999.  Vito was introduced to Blessey by CEG.  Milne testified the first private placement memorandum was produced by Blessey in January 1999.  N.T. 1/14/09 a.m., 49:4.

   To resolve the inconsistency, the jury  would have had to conclude that the first private placement memorandum was mis-dated and that Cleveland misstated the date or that Martin and CEG's billing records are incorrect.  The jury could reasonably have found the date of the first private placement memorandum was unproved; as a consequence, who prepared it was also unproved.  If it were Blessey, the January 1999 date would be correct; if it were Klehr, Harrison, the 1998 date would be correct.  Because the evidence was inconclusive, the first private placement memorandum could have had no bearing on the question of who prepared the second Private Placement Memorandum.

Memorandum with Robert W. Cleveland, Esq., at Klehr, Harrison, Harvey, Branzburg & Ellers LLP.[11]

On July 6, 1999, Bobrowski wrote Brian Shanahan, Esq., also of Klehr, Harrison:

> I want to thank you and Bob Cleveland for completing Lawman's $3.5 million Private
> Placement Memorandum and Subscription documents.  Please review the documents
> thoroughly to assure that all of the changes, comments, and modifications have been
> properly addressed in the documents.  If we do not hear from you by Friday July 9th,
> we will assume that the documents are satisfactory and require no changes.

Ex. 55.

Cleveland testified to drafting errors in the final Private Placement Memorandum which
suggested to him it had been changed after the draft was produced by Klehr, Harrison.   Cleveland
stated the last Klehr, Harrison draft did not include the disputed "Litigation" section.  The Litigation
section in the January private placement memorandum stated, "Neither the Company nor any of its
officers, directors or shareholders are currently engaged in any litigation involving the Company, nor
has any such litigation been threatened."  Ex. 2 at 17.  Cleveland testified the litigation section in the
final Private Placement Memorandum was erroneously drafted because it was overly broad, for
example it would have encompassed an officer's traffic tickets.  N.T. 1/13/09 p.m., 25:7.  Cleveland
also testified he did not draft or add the line in the Private Placement Memorandum which states
"[t]his memorandum has been prepared by Klehr, Harrison. . . ."  Ex. 16 at iii.

Through Cleveland's testimony, the Staffords established that two copies of the Private
Placement Memorandum, one numbered 54 and one numbered 81, contained different wording for
the sections describing the management and potential joint ventures for Lawman.  Ex.s 16 and 17 at
5 and 28.   Cleveland testified neither was a final product of Klehr, Harrison.

---

[11]On cross-examination, Cleveland agreed he knew Vito had sued Klehr, Harrison for legal
malpractice after the firm simultaneously represented the bankruptcy trustee in the Elcom litigation
and Vito in 1999.

On June 29, 1999, Vito sent Milne a copy of the Private Placement Memorandum for the second round of financing and demanded any comments within 24 hours or the Private Placement Memorandum would be sent to the printer without them.  Martin wrote to Vito on July 1, 1999, "This is very unprofessional and unacceptable behavior for any corporation."  Ex. 24 at 2.  Martin reprimanded Vito for failing to obtain the Board's approval before printing the Private Placement Memorandum.  Martin identified several deficiencies in Vito's handling of the Private Placement Memorandum, focusing on the lack of Board involvement.  Martin faxed a copy of the letter to Joshua Smith and stated he had also sent a copy to Powell.  Martin's fax to Smith suggests Vito produced the final draft, referring to "all the problems and the confusion and the things that weren't acceptable and the outlandish things that Bob Vito had decided to do on his own."  N.T. 1/13/09 p.m., 76:22-24.

Milne testified he believed Vito created the Private Placement Memorandum.  N.T. 1/14/09 a.m., 75:6-7.  He testified, "I'm pretty sure, Bob Vito wrote his own private placement and then sent it to Bob Blessey for review and I think Bob Blessey laughed at it."  1/14/09 a.m., 65:19-22.  On July 1, 1999, Blessey faxed Milne, Martin and Powell, stating, "I will not review this document unless so instructed by Robert Vito or Lawman's Board of Directors."  Ex. 23.

Vito testified he did not issue the Private Placement Memorandum.  N.T. 1/20/09 a.m., 19:8.  Vito stated he exchanged drafts of the Private Placement Memorandum with Klehr, Harrison by fax.  He testified he received the final draft from Klehr, Harrison by FedEx on Friday, July 2, Bobrowski took it to Kinko's for printing and binding, and they picked it up on Monday or Tuesday of the next week.[12]  N.T. 1/20/09 a.m., 20: 2-17.   Bobrowski then sent a copy of the bound Private Placement Memorandum to Shanahan, the attorney at Klehr, Harrison with whom he primarily dealt.  Ex. 55.

---

[12]Bobrowski testified he did not take the Private Placement Memorandum to Kinko's.  N.T. 1/13/09 a.m., 123:21.

8

Vito testified, " [W]e just wanted a final sign-off . . .  one final review before we issued it to any investors."  N.T. 1/20/09 a.m., 21:11-14.  Vito explained the identification of Klehr, Harrison as preparer, which Cleveland testified the firm would not have inserted, was added because Powell asked Blessey to review the Private Placement Memorandum.  Blessey "did not want to be listed as somebody who reviewed or prepared it . . . . So [Vito] asked Brian Shanahan to put in language that made sure that Klehr Harrison was the preparer of this PPM and not Mr. Blessey."  N.T. 1/20/09, 23:4-11.

Vito and Lawman had electronic copies of drafts of the Private Placement Memorandum. Blessey testified he sent copies of the first private placement memorandum to Vito electronically in Microsoft Word format.  Vito testified Lawman had Word but not WordPerfect software and could not open WordPerfect documents.  Bobrowski testified he exchanged electronic copies with Cleveland in WordPerfect format. Milne stated the Private Placement Memorandum exchanged electronically was in Word format.  N.T. 1/14/09 a.m., 67:6.  Possession of an accessible electronic copy could have facilitated changes.

Testimony also examined the question of whether amending a private placement memorandum requires offering investors a right of rescission.  In March 1999, Lawman decided to change the number of investors, and Blessey prepared an addendum which included a right of rescission for the early investors.  When the second Private Placement Memorandum was amended on July 22, 1999, to revise the biographies of Smith and Vito to include their associations with companies now bankrupt, Blessey did not recommend including a right of rescission.   Blessey testified, "I'm saying you can amend a private placement memorandum by disclosing, for example, that there's been a prior bankruptcy.  Whether you reach the next level . . . to conclude that rescission

should be offered to an investor, is a completely different legal conclusion." N.T. 1/14/09 p.m., 73:3-

11.  The Addendum was sent to the Staffords and four other investors the day before the tranche was

closed.

      With the agreement of both the Staffords and Vito, the Court gave the jury instructions before

closing arguments and included the standard Pennsylvania Suggested Standard Civil Jury Instructions

on fraud, damages for fraud, contract, breach of contract, contract damages, and rescission.  As to

rescission the Court instructed:

> Rescission of a contract means that one party has a right to undo a contract and to seek
> to put the parties in the position they occupied before the contract was created. A party
> is permitted to rescind a contract if:
>> 1. the party seeking rescission was mistaken as to an essential fact that induced that
>> party to contract and the other party knew or had reason to know that the first party
>> was so mistaken;
>> 2. the party seeking rescission was induced to enter the contract by the fraud of the
>> other party, provided the fraud was to a material part of the contract; or
>> 3. the party seeking rescission relied on a material misrepresentation by the other
>> party, even if the misrepresenting party was ignorant as to the truth or falsity of the
>> representation.
>
> If you find that Plaintiff Stafford Investments, LLC, is entitled to rescind the contract, then
> you must attempt to place the parties in the position they occupied before the contract was
> created.  In doing this, you must determine the value of expenses incurred and money,
> property or other valuable consideration advanced by the party seeking restitution.

N.T. 1/20/09 p.m., 45:15-46:11.  Neither counsel objected to this instructionm.

      The conflation of rescission and breach of contract occurred during the Staffords' closing

argument.  Counsel argued, "So if there's a breach of contract, if there was a misrepresentation in the

private placement memorandum, there was a breach; and since there was a breach – we know there

was a contract – we should be entitled to our money back."  N.T. 1/20/09 p.m., 59:20-23.  Counsel

concluded his argument, stating, "[I]t's a simple breach of contract.  Put the parties back where they

belong: in the beginning, before this thing ever happened.  Give my client his 1,050,000 dollars back.

Take it out of Mr. Vito's pocket; put it back in my client's pocket.  My client takes the shares and puts them back in Mr. Vito's pocket and it's all over."  N.T. 1/20/09 p.m., 64:15-20.

Counsel for Vito in his closing argued there was no breach of contract because the stock purchase agreement between the Staffords and Vito contained five representations and warranties, none of which was breached.  Vito argued, "the misrepresentation was made by a corporation. . . . A mistake was made by a corporate entity, not by Mr. Vito."  N.T. 1/20/09 p.m., 65:15-23.  In rebuttal, the Staffords again argued, "At the end of the day, ladies and gentlemen, my client's entitled to . . . 1,050,000 dollars, either on a breach of contract claim, which is the easiest one, or the Pennsylvania securities fraud case – securities claims because it's clearly a misrepresentation."  N.T. 1/20/09 p.m., 96:8-14.

After deliberations were underway, the jury sent in a question: "Can we give the right of rescission to the plaintiff?  And if so, where on the verdict form do we list that?"  N.T. 1/20/09 verdict, 3:10-12.  The Staffords suggested, "I would respond by saying you find for the plaintiff and then for the amount – it's the amount of damage."  N.T. 1/20/09 verdict, 3:15-17.  The Court then stated, "Rescission is a remedy. . . for the breach of the contract," N.T. 1/20/09 verdict, 4:3-4.  The Court added, "[T]he other thing I could do is just instruct them on rescission."  N.T. 1/20/09 verdict, 4:6-7.  Both sides agreed when the Court stated, "So I'm going to say if there was a breach of contract, one of the remedies is rescission, which means the amount of the damages, of the investment."  N.T. 1/20/09 verdict, 4:23-25.

With the agreement of counsel, the Court re-read the charge on rescission and asked the jury if that answered its question.  The jury said, "no," the parties conferred with the Court at sidebar, and the Court charged the jury, with counsel's agreement, "If you find there was a breach of contract, then

11

you go on to calculate the measure of damages based on the fact that one of the parties is entitled to rescind the contract and be put in the position that they would have been but for the breach of contract." N.T. 1/20/09 verdict, 9:3-8.  Neither party objected.

Soon thereafter, the Court *sua sponte* returned to the courtroom and had the jury brought in to instruct them:

> I believe I gave you a wrong statement of the law when I said that, in order for a party to get rescission, the plaintiff had to prove that there was a breach of contract. That instruction is wrong as a matter of law, and I made a mistake and I want to correct that. The only circumstances are the circumstances that I defined for you, and I'm going to read that again. Rescission of a contract means that one party has a right to undo a contract and to seek to put the parties in the position they occupied before the contract was created. Created, not breached. Created. A party is permitted to rescind the contract if one of the three circumstances occurs: (1) the party seeking rescission was mistaken as to an essential fact that induced that party to contract and the other party knew or had reason to know that the first party was so mistaken; (2) the party seeking rescission was induced to enter the contract by the fraud of the other party, provided the fraud was to a material part of the contract; or (3) the party seeking rescission relied on a material misrepresentation by the other party, even if the misrepresenting party was ignorant as to the truth or falsity of the representation. If you find that Plaintiff Stafford Investments, LLC is entitled to rescind the contract, then you must attempt to place the parties in the position they occupied before the contract was created. In doing this, you must determine the value of the expenses incurred and money property or other valuable consideration advanced by the party seeking rescission. Those are the only circumstances under which you can find that a party may be entitled to rescind a contract. With that clarification, do you understand my instructions now? Juror number – please answer yes or no.
>
> THE FOREPERSON: Yes.
>
> THE COURT: [I]f you don't understand, I want you to go back there and tell me . . .  write me another question . . .
>
> THE FOREPERSON: We'll write you another question.
>
> THE COURT: Okay. Very well.

N.T. 1/20/09 verdict, 12:3-13:15.

After the jury left the courtroom, the Staffords asked if there was going to be an addition to

the jury slip.  The Court noted Vito's position that rescission is an equitable remedy, beyond the

purview of the jury, and suggested, "[W]e could put a special interrogatory in the verdict slip and

submit it to them.  If you're right, it's advisory.  If you're wrong, we have the verdict on that count."

N.T. 1/20/09 verdict, 13:23-14:2.  The Staffords objected, arguing, "[W]e had a rather straightforward

simple verdict slip that says do you find there was a breach of contract, if so, money damages: do you

find –"  N.T. 1/20/09 verdict, 14:15-18.  The Court interrupted, stating, "[B]reach of contract has

nothing to do with rescission – . . . [R]escission is a total separate claim . . .  I asked you to think

about the verdict slip; nobody thought about it but the jury has."  N.T. 1/20/09 verdict, 14:19-20.  The

Court suggested a revised verdict slip which asked the jury if the Staffords were entitled to rescission

and the amount of damages.  Vito reiterated his objection to a new verdict slip on grounds the remedy

is equitable.

   The verdict slip as amended and returned by the jury was:

### OFFICIAL VERDICT FORM
#### Violation of the Securities Exchange Act of 1934 (the "10b-5 Claim")
Do you find for plaintiff Stafford Investments LLC _____ or defendant Robert Vito _✓____?
If you find for plaintiff Stafford Investments LLC, damages are awarded in the amount of:
   Compensatory damages:   $_____
#### Violation of the Pennsylvania Securities Act

Do you find for plaintiff Stafford Investments LLC _____ or defendant Robert Vito _✓____?
If you find for plaintiff Stafford Investments LLC, damages are awarded in the amount of:
   Compensatory damages:   $_____
#### Breach of Contract

Do you find for plaintiff Stafford Investments LLC __✓___ or defendant Robert Vito _____?
If you find for plaintiff Stafford Investments LLC, damages are awarded in the amount of:
   Compensatory damages:   $_____0_____
#### Rescission of the Contract
Do you find that plaintiff Stafford Investments LLC is entitled to rescission of the contract?
    Yes ___✓____         No _____
If you find that plaintiff Stafford Investments LLC is entitled to rescission of the contract, damages
are awarded in the amount of:

13

Damages:          $_____0_____

### Common Law Fraud / Fraud in the Inducement

Do you find for plaintiff Stafford Investments LLC _____ or defendant Robert Vito __✓___?

If you find for plaintiff Stafford Investments LLC, damages are awarded in the amount of:

      Compensatory damages:          $_____

      Punitive damages:          $_____

The jury found for the Staffords on breach of contract but awarded zero damages and found the Staffords were entitled to rescission but entered zero for damages.  On all other counts the jury found for Vito.

Both Vito and the Staffords filed post-verdict motions.  Vito's Motion for Judgment Notwithstanding the Verdict argues the discussion about, and the two instructions regarding, rescission confused the jury and led it to believe it had to find a breach of the contract before reaching rescission.  He also argues the jury's finding of a breach of the contract without any damages is inconsistent and suggests the jury did not find the contract was breached.  Vito also argues the Staffords asked for rescission solely on the basis of fraud, not on the basis of mistake.  Vito argues the evidence showed the "no litigation" language was inserted by Lawman's attorney by mistake, not fraudulently.  With regard to the remedy, Vito argues rescission requires both parties to be restored to the *status quo ante*.  This, he argues, the Staffords cannot do because they opted not to receive their shares of Unbreakable Nation, second generation successor company to Lawman, and instead took a check.

In reply, the Staffords argue their prayer for relief, including "whatever other remedy the court deems appropriate," satisfied  the notice pleading standard.[13]  The Staffords argue the jury was not

---

[13]The federal rules permit a plaintiff to plead alternative "claims for relief" or "statements of a claim." Fed. R. Civ. P. 8(a), (e)(2).  Modern rules of pleading permit the simultaneous pleading of inconsistent claims for relief.  *See Kansas State Bank in Holton v. Citizens Bank of Windsor*, 737 F.2d 1490, 1499 (8th Cir. 1984) (explaining that the use of the election of remedies doctrine "to

confused because the Court "quickly corrected and supplemented" its initial response to the jury's question on rescission.

For their part, the Staffords argue the Court should harmonize the verdict and award them $1,050,000, the return of their initial investment. The Staffords argue the jury found Vito breached the contract and the Staffords are entitled to rescission. The finding of $0 damages should be read, the Staffords argue, as the jury's verdict that the Staffords are not entitled to any more damages than return of their investment for rescission. Alternatively, the Staffords argue if rescission is an equitable remedy, they should receive $1,050,000. The Staffords also argue they are entitled to a new trial under Rule 59 because the jury's verdict was against the great weight of the evidence and a miscarriage of justice will result if the verdict is allowed to stand. *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). They argue the jury found Vito breached the contract and the Staffords are entitled to rescind. Without an award of $1,050,000, they argue, the result is a miscarriage of justice.

**DISCUSSION**

When considering Rule 50 motions, the Court may overturn a jury verdict only when, "as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Raiczyk v. Ocean County Veterinary Hosp.*, 377 F.3d 266, 268 (3d Cir. 2004). With regard to the Staffords' Motion to Alter Judgment under Rule 59(e), the law is "[f]ederal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Patzig*

---

prevent parties from pleading inconsistent theories of relief . . . has been eviscerated by the permissive rules of pleading").

*v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978) (citation and internal quotation marks omitted).

Rule 50 and 59 motions are granted "sparingly." *Goodman v. Penn. Turnpike Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). The question in this case is reconciling the jury's finding of a breach of contract and rescission and awarding no damages. When confronted with an inconsistent verdict, "a district court must render a judgment that makes the jury's answers consistent if such a construction is possible." *Ploughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 104 (3d Cir. 1993).

A trial court is "under a constitutional mandate to search for a view of the case that makes the jury's answers consistent." *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763-64 (3d Cir. 1990). A court may "allow an apparently inconsistent verdict to stand." *City of Los Angeles v. Heller*, 475 U.S. 796, 806 (1986)(Stevens, J., dissenting) (collecting cases). The Third Circuit rejects resolving an inconsistency by "directing a judgment notwithstanding the jury's verdict on one claim on the sole ground that it was inconsistent with the jury's verdict on another claim." *Mosley v. Wilson*, 102 F.3d 85, 91 (3d Cir. 1996) (citing Justice Stevens's dissent in *Heller* with approval).

When the Court considers the verdict against this backdrop, the Court finds no inconsistency. The jury found a breach of the contract between Vito and the Staffords. The jury could have concluded reasonably that, based on evidence the Elcom litigation was not mentioned in the private placement memorandum which had been incorporated by reference in the sales contract, Vito materially breached the contract. The jury could reasonably have found the omission of this material fact from the contract caused the Staffords no damages because they learned of the Elcom litigation before they purchased the shares in 2000.

With its verdict in Counts 1, 2, and 5, the jury rejected the Staffords' argument and evidence

16

Vito intended a fraud when he circulated the private placement memorandum.  To find fraud, the jury would have had to decide Vito intentionally inserted the "no litigation" representation to mislead investors.  The jury reasonably could have decided who wrote, changed, and reviewed the Private Placement Memorandum was not resolved by the evidence.

The remaining question is reconciling the jury's vote for rescission in the absence of fraud. The Court will treat the jury's verdict on rescission as advisory.  Rescission is an equitable remedy. *Plechner v. Widener Coll., Inc.*, 569 F.2d 1250, 1256-57 (3d Cir. 1977).  Rescission is not a remedy for breach of contract, despite the confusion during closing argument.  Only when a plaintiff proves fraud in the inducement may he choose between rescinding the contract, or affirming the contract and suing for damages.  *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 456 (1971).  If a plaintiff proves a "gross misrepresentation of facts, relating to the subject of a contract, the contract is fraudulent and void."  *Cochran v. Cummings*, 1802 WL 1140, 1, 4 U.S. 250 (1802).   Only when one party's refusal to perform a contract "constitutes such a repudiation as to entitle the other contracting party to treat the contract as rescinded" is rescission a remedy for breach.  *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958).

In this case, the contract was not repudiated.  The Staffords and Vito performed the contract, which called for the exchange of money for shares.   The Staffords argument that the misrepresentation in the Private Placement Memorandum about litigation deprived them of the benefit of their bargain, purchasing shares in a company with blemish-free management, is an argument for contract damages not rescission.  Contract law provides "damages which were in the contemplation of the parties at the origination of the agreement."  *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 283 (Pa. 2005).  Contract law protects "the expectations bargained for."  *Id.*

17

An effective demand for rescission requires prompt action.  *Schwartz v. Rockey*, 932 A.2d 885, 891-92 (Pa. 2007).  A "buyer must act to rescind within a reasonable time. . . . What is a reasonable time is what a reasonable, prudent man would do under given time and circumstances.  It is a question of fact which will vary under different conditions, so much so that no fixed rule can be laid down."  *Siskin v. Cohen*, 70 A.2d 293, 294-95 (Pa. 1950).  Statutory rescissions reflect the requirement for prompt action.  *See* Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* (providing three days to rescind); Pennsylvania's Door-to-Door Sales Act, 73 P.S. § 201-7 (same).

Rescission "can only be granted where the parties to a contract can be restored to their original positions with regard to the subject matter of the contract."  *Doppler v. Doppler*, 574 A.2d 1101, 1106 (Pa. Super. Ct.1990).  Pennsylvania law prohibits a rescission of contract where the court's equitable powers cannot place the parties in the same position in which they would have been had the contract never been formed.  *Briggs v. Erie Ins. Grp.*, 594 A.2d 761, 765 (Pa. Super. Ct. 1991) (Brosky, J., concurring), *overruled en banc in part on other grounds by Dempsey v. Cessna Aircraft Co.*, 653 A.2d 679, 682 (Pa. Super. Ct. 1995), appeal denied, 663 A.2d 684 (Pa. 1995).

Because rescission is an equitable remedy, it is for the Court to decide.  To effectively demand rescission, the Staffords would have had to act promptly.  *Siskin*, 70 A.2d at 295.  The evidence in this case strongly suggests the Staffords knew about the Elcom litigation in 1999 **before** they bought Vito's 300,000 shares in 2000, but did not demand rescission.  This Court is unable, after the passage of a decade, to restore the parties to the *status quo ante*, *Briggs*, 594 A.2d at 765, because the Staffords no longer own the shares of Lawman stock.  Rescission is therefore unavailable.

The jury rejected the three counts based on fraud or misrepresentation.  By rejecting the counts based on fraud or misrepresentation, the jury leaves me no ground on which to order rescission.

18

When the jury finds no basis for the underlying tort, in this case fraud, the Court cannot reconcile an inconsistent verdict by awarding the remedy. *Acumed LLC v. Advanced Surgical Serv., Inc.* 561 F.3d 199, 217-18 (3d Cir. 2009). The jury affirmatively found no fraud and there was no evidence presented which would conclusively uphold a finding of fraud.[14] Without proof of an underlying harm, the jury's advice on a remedy is immaterial.

The imposition of costs under Federal Rule of Civil Procedure 54(d)(1) has an element of discretion. Rule 54(d)(1) is a melding of the former rules of the separate courts of law and equity; costs were mandatory at law and discretionary at equity. *Smith v. Se. Pa. Transp. Auth.*, 47 F.3d 97, 99 (3d Cir. 1995) (per curiam) (footnote omitted). Before 2007, the rule provided "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1)(repealed 2007). After the 2007 amendments, the Rule now provides "costs . . . should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The word "should" retains both the discretionary aspect of the former Rule's phrase "unless the court otherwise directs" and the mandatory aspect of "costs . . . shall be allowed as of course." *See In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 457 (3d Cir. 2000). In this case, the verdict sheet contained five questions. The parties split those five decisions, the jury finding for Vito on three of them and for the Staffords on two; thus, I will order each side to bear its own costs.

An appropriate order follows.

---

[14]The jury also did not find a violation of section 10-b of the Securities Act. Vito gave the jury alternative grounds on which to deny the Securities Act claim: no material misrepresentation and a statute of limitations bar. The Court has no way to determine which theory the jury accepted.